Dear Chairman Kirtley,
¶ 0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following questions:
1. Whether the Oklahoma Water Resources Board can, by rule,interpret the term "nonprofit organization," as used in 82 O.S.Supp. 1998, § 1020.11a[82-1020.11a], to include the United Statesgovernment, its subdivisions, the government of the State ofOklahoma, its subdivisions, and local governments.
 2. Whether the Oklahoma Water Resources Board can, by rule,interpret 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] to apply only toareas or facilities which are used or capable of being used atleast six months each year for outdoor camping or outdoorrecreation activities.
 3. Whether a facility or area owned by a nonprofitorganization has to be a camp or recreational site to beprotected by the three-mile setback prohibition set forth at 82O.S. Supp. 1998, § 1020.11a[82-1020.11a].
 4. Whether applicants seeking permits or amendments to permitsto use groundwater for a swine animal feeding operation should berequired to provide notice to all owners or lessees of thesurface estate of lands located within three miles of the outsideboundary of the swine animal feeding operation.
¶ 1 It appears that the above-listed questions derive in large part from issues surrounding the interpretation of 82 O.S. Supp.1998, § 1020.11a[82-1020.11a], which provides as follows:
 Except for renewals, the Oklahoma Water Resources Board shall not issue any permit or amendment thereto or other authorization for the use of water for any swine animal feeding operation wholly or partially located within three (3) miles of the outside boundary of any area or facility owned or operated as a camp or recreational site by a nonprofit organization.
82 O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1), and an emergency rule promulgated thereunder by the Oklahoma Water Resources Board ("the Board"), namely OAC 785:30-3-5.1, the relevant portions of which provide as follows:
 (d) For purposes of this section, the following shall apply:
 (1) Nonprofit organizations include organizations recognized by the Internal Revenue Service as tax exempt pursuant to Section 501(c) of the federal Internal Revenue Code, organizations registered with the Oklahoma Secretary of State as a nonprofit corporation or otherwise pursuant to Title 18 of the Oklahoma Statutes, and federal, state and local governments.
. . . .
 (3) The outside boundary of any area or facility owned or operated as a camp or recreational site by a nonprofit organization shall be considered that line drawn along the outside perimeter of any tract or tracts of land designated as a wildlife management area, wildlife refuge, park, camping or recreational site shown on U.S.G.S. topographic or other widely disseminated maps or other information submitted to the Board. The camp or recreational site must be capable of being used at least six months each year for outdoor camping activities or outdoor recreation activities.
OAC 785:30-3-5.1.
¶ 2 The opinions set forth herein require an analysis of statutes and case law relating to the administrative rulemaking function of agencies of the State of Oklahoma, case law relating to construction and interpretation of statutes, as well as case law relating to due process requirements of the United States and Oklahoma Constitutions.
 I. THE BOARD'S EMERGENCY RULE OAC 785:30-3-5.1 AND ITS INTERPRETATION THEREIN OF 82 O.S. SUPP. 1998, § 1020.11a[82-1020.11a]
A. Agency Rulemaking Authority Generally
¶ 3 The Oklahoma Legislature, by statutory enactment, determines policies and establishes standards, but may direct an administrative agency "to enforce the same by making rules of subordinate character within the prescribed limits to carry out such policy and in connection therewith determine some of the facts on which the law depends." State Board of Agriculture v.Warren, 331 P.2d 405, 408 (Okla. 1958). An administrative agency's power to make rules under statutory authority is limited to the authority granted by those statutes and such rules may not be contrary to those statutes. Adams v. Professional PracticesCommission, 524 P.2d 932, 934 (Okla. 1974). In considering such administrative rules, it is generally presumed that an administrative agency "has acted regularly and in a lawful manner." State Board of Agriculture v. Warren, 331 P.2d 405,408 (Okla. 1958). Rules adopted or promulgated by administrative agencies under legislative authority are therefore "presumed valid and reasonable." Public Service Company of Oklahoma v.State, 918 P.2d 733, 738 (Okla. 1996). Further, it is presumed that rules and regulations were adopted by administrative agencies "to accomplish in a fair and reasonable way the objects of the legislative act, and this presumption continues until the contrary appears by competent and convincing evidence." Ex ParteWoodruff, 210 P.2d 191, 197 (Okla.Crim.App. 1949).
B. The Board's Rulemaking Authority
¶ 4 The Oklahoma Legislature has granted the Board broad rulemaking authority by empowering the Board to make such rules, regulations and orders as the Board may deem necessary or convenient to the exercise of any of the powers or the performance of any of the duties conferred or imposed upon it by, among other things, the Oklahoma Groundwater Law, 82 O.S. 1991and Supp. 1998, §§ 1020.1-1020.22 (hereinafter "the Groundwater Law"). 82 O.S. Supp. 1998, § 1085.2[82-1085.2](7). As part of its responsibilities under the Groundwater Law, the Board is charged with reviewing and conducting hearings relating to applications to use groundwater, 82 O.S. Supp. 1998, §§ 1020.7[82-1020.7] and 1020.8, and approving such applications to use groundwater where the Board determines that certain statutory requirements have been met. 82 O.S. Supp. 1998, § 1020.9[82-1020.9]. Even more specifically, the Oklahoma Legislature has directed the Board to establish rules and regulations governing the form of applications to use groundwater, 82 O.S. Supp. 1998, § 1020.7[82-1020.7], and governing the provision of notice of applications to use groundwater. 82 O.S.Supp. 1998, § 1020.8[82-1020.8].
C. Inclusion of Governments and Their Subdivisions in theInterpretation of the Term "nonprofit organization" in 82 O.S.Supp. 1998, § 1020.11a[82-1020.11a] is Reasonable and Supported byLegislative Intent
¶ 5 In the case J. Brotton Corporation v. Oklahoma AlcoholicBeverage Laws Enforcement Commission, 822 P.2d 683 (Okla. 1991), the Oklahoma Supreme Court noted its duty to uphold administrative agency rules interpreting a statute where such rules are reasonable and supported by legislative intent. Id.
at 686. Therefore, it must be determined whether Section (d)(1) of the Board's emergency rule OAC 785:30-3-5.1, which interprets the term "nonprofit organization" in 82 O.S. Supp. 1998, §1020.11a[82-1020.11a] to include governments and their subdivisions, is a reasonable interpretation of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a],
supported by the intent of the Oklahoma Legislature.
¶ 6 In Brotton, the Oklahoma Supreme Court upheld an administrative rule interpreting Section 518.2 of Title 37, which prohibited the issuance of mixed beverage licenses for clubs within 300 feet of churches or public schools. The administrative rule in question interpreted the term "public schools" in Section 518.2 to include public universities. In upholding the administrative rule, the Oklahoma Supreme Court noted that, among other things, the legislative intent behind 37 O.S. Supp. 1990,§ 518.2[37-518.2] was the protection of religious and educational activities, and that the Oklahoma Legislature provided no cause in the Oklahoma Alcoholic Beverage Control Act to infer that it merely intended to protect minors. Id. at 685. To hold otherwise, according to the Oklahoma Supreme Court, would defeat the goals and purposes of Section 518.2 of Title 37. Id. at 686.
¶ 7 Like the situation in Brotton, the Board's emergency rule OAC 785:30-3-5.1, which interprets the term "nonprofit organization" to include governments and their subdivisions, is a reasonable interpretation of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a]
that is supported by the legislative intent behind the section. The legislative purpose and goal of 82 O.S. Supp. 1998, §1020.11a[82-1020.11a] is the protection of camping and recreational activities. While the term "nonprofit organization" is not defined in Senate Bill No. 1175, 1998 Okla. Sess. Laws ch. 404, of which 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] is a part, governments are literally organizations that are not operated for profit and it seems probable that the Oklahoma Legislature intended to exclude only those camps or recreational sites owned or used "for profit." In Senate Bill No. 1175, the Oklahoma Legislature clearly evidenced its design to protect government-owned tracts of land used for camping or recreational purposes from swine animal feeding operations. For example, State parks and resorts,2 O.S. Supp. 1998, § 9-210.1[2-9-210.1](F)(1); designated scenic river areas, 2 O.S. Supp. 1998, § 9-210.3[2-9-210.3](D)(1); historic properties and museums owned by the State of Oklahoma, 2 O.S. Supp. 1998, §9-210.3[2-9-210.3](D)(3); and national parks, 2 O.S. Supp. 1998, §9-210.3[2-9-210.3](D)(5), are all protected by a three-mile setback from certain animal feeding operations similar to that set forth in82 O.S. Supp. 1998, § 1020.11a[82-1020.11a].
¶ 8 Moreover, a contrary interpretation would unreasonably restrict the purpose and intent of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a], and lead to an incongruous result in its application by protecting only a segment of lands owned or operated as camps or recreational sites by organizations that are not run for profit. The Oklahoma Legislature provided no cause in 82 O.S. Supp.1998, § 1020.11a[82-1020.11a] or anywhere in Senate Bill No. 1175 (1998 Okla. Sess. Laws ch. 404) to infer that it intended to exclude camps or recreational sites owned or operated by governments or their subdivisions from the three-mile setback provisions. Further, it is difficult to divine any cogent, distinguishing characteristics between those camps and recreational sites owned or operated by governments and those owned or operated by traditional nonprofit organizations, especially in light of the probability that the camps and recreational sites owned or operated by governments or their subdivisions are generally frequented by large numbers of citizens, as opposed to a smaller subgroup of the citizenry which are members of nonprofit organizations.
¶ 9 In sum, the Board's emergency rule OAC 785:30-3-5.1 is reasonable and conducive to the accomplishment of the legislative purpose behind 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a]. The reasonableness of the Board's emergency rule OAC 785:30-3-5.1
derives from the fact that it is an interpretation of 82 O.S.Supp. 1998, § 1020.11a[82-1020.11a], that governments are literally organizations not operated for profit, and that the rule complies with the intent of the Oklahoma Legislature to protect camping and recreational activities, even at sites owned or operated by governments or their subdivisions.
D. Requirement That Camps or Recreational Sites Be Used orCapable of Being Used as Camps or Recreational Sites For SixMonths Each Year is Beyond the Rulemaking Authority of the Board
¶ 10 The final clause of Section (d)(3) in the Board's emergency rule OAC 785:30-3-5.1 requires that to be eligible for the three-mile setback of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a],
"[t]he camp or recreational site must be capable of being used at least six months each year for outdoor camping activities or outdoor recreation activities." Unlike the Board's interpretation of the term "nonprofit organization," the Board's interpretation of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] as set forth in the final clause of its emergency rule OAC 785:30-3-5.1(d)(3) adds a substantive requirement which is subversive to the accomplishment of the legislative purpose expressed in 82 O.S. Supp. 1998, §1020.11a[82-1020.11a].
¶ 11 As stated above, rules adopted or promulgated by administrative agencies under legislative authority are presumed valid and reasonable. Public Service Company of Oklahoma v.State, 918 P.2d 733, 738 (Okla. 1996). However:
 The only authorized basis for any rule is that it is a means to the accomplishment of the legislative purpose expressed in the statute and its quality is to be judged by the effect thereof when used. If conducive to such purpose, it is authorized by the statute. If not so conducive, it is not authorized by the statute and therefore without the force of law.
Application of State Board of Medical Examiners, 206 P.2d 211,215 (Okla. 1949).
¶ 12 The facts of Application of State Board of MedicalExaminers, 206 P.2d 211 (Okla. 1949), reveal that the Oklahoma Legislature enacted a statute requiring the State Board of Medical Examiners to admit any applicant to the regular examination for a license to practice medicine and surgery who, among other requirements, was a graduate of a legally chartered medical college or university, the requirements of which for graduation were, at the time of such graduation, in no particular less than those prescribed by the Association of American Medical Colleges. The State Board of Medical Examiners was also granted the authority to issue necessary rules and regulations, in pursuit of which the State Board of Medical Examiners promulgated two rules, one of which required applicants to have graduated from class "A" medical schools, as classified by the Association of American Medical Colleges. The second rule, known as Rule 7, barred graduates from certain foreign medical schools from eligibility for licensure. When Robert E. Nathan, a graduate of a medical school in Florence, Italy, made application to the State Board of Medical Examiners, he was denied as in violation of the aforementioned rules. The appeal board however, held that Nathan's application should be granted in that he met the requirements of the statute.
¶ 13 The question considered by the Oklahoma Supreme Court was whether the appeal board exceeded its jurisdiction in so holding. In considering this question, the Oklahoma Supreme Court noted that:
 The authority to make rules and regulations is given, but no power is conferred or attempted to be conferred upon the Commission to give the rules and regulations the force and effect of a law. Whatever force and effect the rule has, is derived entirely from the statute. No authority is given to change the law in any way. Authority to make rules for the complete lawful operation of the statute is all that is given.
Id. at 215 (emphasis added) (citation omitted).
¶ 14 Importantly, under the statute, the possession of a diploma from a class "A" school was not made a condition precedent to being permitted to take the examination, but under the rule it was such a condition precedent. Id. The Oklahoma Supreme Court therefore concluded that:
 [T]o hold that the applicant in this case is to be debarred from applying because he does not have a diploma from a Grade A school is not only not conducive to accomplishing the purpose of the statute but is subversive thereof by withholding from the applicant a right afforded by the statute and excusing the Board from the performance of a duty enjoined thereby. We hold that rule 7, relied on by the Medical Board as authority for its action, is inoperative because unauthorized[.]
Id. at 216.
¶ 15 Like the situation in Application of State Board ofMedical Examiners, that portion of the Board's emergency rule OAC 785:30-3-5.1 interpreting 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] to require a camp or recreational site to be used or be capable of being used for six months each year for outdoor camping or outdoor recreational activities creates an additional requirement contemplated neither by the Oklahoma Legislature nor the plain language of the statute, which contains no such six month requirement. Such an interpretation is not conducive to accomplishing the purpose of the statute, but rather is subversive to its goals, eroding the protections of the three-mile setback in 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] for legitimate, established camps or recreational sites, just because such camps or recreational sites are not used, or capable of being used, for six months each year for outdoor camping or outdoor recreational facilities. For example, a typical summer camp for children or young adults is operated for two or three months per year due to the realities of the market for such camps. Such summer camps cater to children, young adults, and their families during summer vacation from school. However, under the Board's emergency rule OAC 785:30-3-5.1, such camps would not be entitled to the protection of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a]
even though such camps may meet all of the statutory requirements for such protection.
¶ 16 The addition of the six-month requirement crosses the barrier between the legitimate, interpretational objectives of the Board and the legislative power reserved to the Oklahoma Legislature. The Oklahoma Legislature drew no distinctions and created no requirements relating to the time periods during which such camps or recreational sites are used. The limitation is that the subject real property must have been owned or leased by such nonprofit organization "prior to the construction or establishment of the swine animal feeding operation." 82 O.S.Supp. 1998, 1020.11a(A)(2). With this sole limitation, the Oklahoma Legislature extended the protections of 82 O.S. Supp.1998, § 1020.11a[82-1020.11a] to all camps and recreational sites owned or operated by nonprofit organizations. Accordingly, like the situation in Application of State Board of Medical Examiners,
that portion of the Board's emergency rule OAC 785:30-3-5.1, which interprets 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] to require camps or recreational sites be used or capable of being used for six months each year for outdoor camping or outdoor recreational activities is unauthorized and in excess of the jurisdictional grant of rulemaking authority extended to the Board by the Oklahoma Legislature.
¶ 17 Certainly, the Board must interpret the Oklahoma Legislature's directive as set forth in 82 O.S. Supp. 1998, §1020.11a[82-1020.11a]. It is the province of the Board, within the limits prescribed by the Oklahoma Legislature, to carry out the policy of the Oklahoma Legislature as set forth in 82 O.S. Supp. 1998,§ 1020.11a[82-1020.11a], and to determine some of the facts on which that law depends. State Board of Agriculture v. Warren, 331 P.2d 405,408 (Okla. 1958). In so doing, the Board may, by rule, define "camp or recreational site" within the bounds of the statute or it may choose to compile, by rule, a list of factors to consider in making the factual determination as to whether the ownership or operation of any parcel of land is as a "camp or recreational site" as contemplated by the Oklahoma Legislature in 82 O.S.Supp. 1998, § 1020.11a[82-1020.11a].
 II. APPLICATION OF 82 O.S. SUPP. 1998, § 1020.11a(A)(1) TO LANDS OWNED BY NONPROFIT ORGANIZATIONS BUT NOT OPERATED AS CAMPS OR RECREATIONAL SITES
¶ 18 It is axiomatic that "when the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction beyond the statute itself." Inre Estate of Little Bear, 909 P.2d 42, 50 (Okla. 1995). However, where a statute's language is ambiguous, the fundamental rule of statutory construction is "to ascertain and, if possible, give effect to the Legislature's intention and purpose as expressed in a statute." Hill v. Board of Education, 944 P.2d 930, 931
(Okla. 1997). Importantly, statutes should not be construed so as to have "absurd or discriminatory consequences"; a construction that would lead to absurdity or to discriminatory treatment will be avoided if it can be done without violating legislative intent, and the Legislature will not be presumed to have intended vain or absurd result. Cox v. Dawson, 911 P.2d 272, 281 (Okla. 1996).
¶ 19 The plain language, once again, is as follows:
 Except for renewals, the Oklahoma Water Resources Board shall not issue any permit or amendment thereto or other authorization for the use of water for any swine animal feeding operation wholly or partially located within three (3) miles of the outside boundary of any area or facility owned or operated as a camp or recreational site by a nonprofit organization.
82 O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1) (emphasis added).
¶ 20 The above-quoted language is unambiguous. Lands owned by nonprofit organizations as camps or recreational sites and lands operated by nonprofit organizations as camps or recreational sites are protected by a three-mile setback from swine animal feeding operations. Lands owned or operated by nonprofit organizations, but not owned or operated as camps or recreational sites do not receive the protection of the three-mile setback. A contrary reading of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] is awkward, and if intended by the Oklahoma Legislature, could have been easily denoted by commas, parentheses, or an alternative drafting.
¶ 21 Even if the above-quoted language of 82 O.S. Supp. 1998,§ 1020.11a[82-1020.11a](A)(1) were ambiguous and susceptible to variable interpretations, it is clear that the intent of the Oklahoma Legislature is that the three-mile setback does not apply to lands owned or operated by nonprofit organizations, but not owned or operated as camps or recreational sites. Instructive as to the intent of the Oklahoma Legislature in enacting 82 O.S. Supp.1998, § 1020.11a[82-1020.11a](A)(1) is the title to Senate Bill No. 1175, of which 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] is a part, the relevant portion of which provides as follows:
 An Act relating to agriculture . . . prohibiting the Oklahoma Water Resources Board to issue permits for the use of water for any swine feeding operation located three miles from a nonprofit camp or recreational facility[.]
1998 Okla. Sess. Laws ch. 404, title (emphasis added).
¶ 22 Noticeably absent from the above-quoted language, and indeed in the title to the bill as a whole, is any reference to prohibitions against the Board's issuance of groundwater permits for swine animal feeding operations within three miles of lands owned or operated by nonprofit organizations, but not owned or operated by nonprofit organizations as camps or recreational sites. Rather, the above-quoted language in the title to Senate Bill No. 1175 is strictly limited to the issuance of permits to use groundwater for swine feeding operations located within three miles of a "nonprofit camp or recreational facility."
¶ 23 Additionally, it is informative to note that language similar to that used in 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1) was used by the Oklahoma Legislature elsewhere in Senate Bill No. 1175. For example, Title 2 provides that:
 Except as otherwise provided by this section, no licensed managed feeding operation which applies for a new or expanding concentrated animal feeding operation license after March 9, 1998, shall be located within three (3) miles of the outside boundary of any area or facility owned or operated as a camp or recreational site by a nonprofit organization established prior to application of the concentrated animal feeding operation.
2 O.S. Supp. 1998, § 9-210.3[2-9-210.3](B) (emphasis added).
¶ 24 Again, the portion of the title of Senate Bill No. 1175 corresponding to 2 O.S. Supp. 1998, § 9-210.3[2-9-210.3](B) makes no reference to any intent of the Oklahoma Legislature to prohibit applications for new or expanding concentrated animal feeding operation licenses within three (3) miles of lands owned by nonprofit organizations, but not owned or operated as camps or recreational sites:
 An Act relating to agriculture . . . providing for determination of distances for setbacks from certain camps, recreational sites, scenic river areas, certain historic properties or museums or certain water reservoirs[.]
1998 Okla. Sess. Laws ch. 404, title (emphasis added).
¶ 25 Clearly, as set forth in the title to Senate Bill No. 1175, the Oklahoma Legislature intended the three-mile setback in2 O.S. Supp. 1998, § 9-210.3[2-9-210.3](B) be limited in application to lands owned or operated as camps or recreational sites.
¶ 26 Other tools of statutory construction also provide useful insight as to the intent of the Oklahoma Legislature in relation to 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a]. "Doubt as to meaning of a statute may be resolved by reference to its history." City ofHugo v. State, 886 P.2d 485, 493 n. 26 (Okla. 1994). More specifically, in construing a statute, one may look to the history of the time when an act was passed in order to ascertain the meaning of a particular provision of an act. Home-StakeProduction Co. v. Board of Equalization, 416 P.2d 917, 926
(Okla. 1966) (citation omitted). Further, courts will take judicial notice of contemporary history, prior state of the law, particular abuse or defect which act was meant to remedy and will then apply the language of the act. Id.
¶ 27 The historical context within which 82 O.S. Supp. 1998, §1020.11a[82-1020.11a] was enacted by the Oklahoma Legislature must be recalled. The time period during which 82 O.S. Supp. 1998, §1020.11a[82-1020.11a](A)(1) was introduced, considered, and ultimately enacted was one dominated by public and private debate relating to Canyon Camp, a camping and recreational site operated by the United Methodist Conference of Oklahoma, and the proposed location of a concentrated animal feeding operation within close range of Canyon Camp. It is important to note that prior legislation relating to concentrated animal feeding operations contained no such similar provisions relating to camps or recreational sites. Therefore, in gleaning the Oklahoma Legislature's intention as it relates to 82 O.S. Supp. 1998, §1020.11a[82-1020.11a](A)(1), the Canyon Camp situation was certainly perceived by the Oklahoma Legislature as a defect in the existing statute applicable to concentrated animal feeding operations, which Senate Bill No. 1175, and 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a],
among other provisions, was intended to remedy.
¶ 28 As set forth above, another rule of statutory construction is that statutes should not be construed so as "to have absurd or discriminatory consequences." Cox v. Dawson, 911 P.2d 272, 281
(Okla. 1996). Any interpretation of 82 O.S. Supp. 1998, §1020.11a[82-1020.11a](A)(1) to apply to lands owned or operated by nonprofit organizations, but not owned or operated by nonprofit organizations as camps or recreational sites would lead to incongruous results that undoubtedly extend beyond the intent of the Oklahoma Legislature. For example, lands donated, sold, bequeathed, devised, or in any way transferred to nonprofit organizations would fall within the protection afforded by 82O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1), notwithstanding the fact that such lands may be used for commercial, industrial, or agricultural purposes, or even as a concentrated animal feeding operation. Without doubt, the Oklahoma Legislature could not have intended 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a] to lead to such illogical application.
¶ 29 The policy behind 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1) was undoubtedly to protect and preserve the use of lands for camping and recreational activities from the potential deleterious impacts caused by concentrated animal feeding operations. However, the intent of the Oklahoma Legislature was to afford such protection to both those lands owned as camps or recreational sites by nonprofit organizations and to those lands operated by nonprofit organizations as camps or recreational sites. Any extension of the three-mile barrier provided for in82 O.S. Supp. 1998, § 1020.11a[82-1020.11a](A)(1) to lands simply owned by nonprofit organizations would fail to effect, indeed even contravene, the intent of the Oklahoma Legislature.
 III. DUE PROCESS RIGHTS OF LANDOWNERS WITHIN THREE MILES OF OUTSIDE BOUNDARIES OF CONCENTRATED ANIMAL FEEDING OPERATIONS
¶ 30 Neither the Groundwater Law nor the Board's rules require that notice of an application for the use of groundwater for a swine animal feeding operation be provided to persons owning or leasing the surface estate of lands located within three miles of the outside boundary of a swine animal feeding operation. However, as provided in the Groundwater Law, "[a]ny interestedparty shall have the right to protest said application and present evidence and testimony in support of such protest." 82O.S. Supp. 1998, § 1020.8[82-1020.8] (emphasis added).[1] By rule, the Board has determined that notice of an application to use groundwater must be published and provided by certified mail to all surface estate owners of lands located within 1,320 feet of the outside boundaries of each ten-acre tract within which the applicant's existing or proposed wells will be located. OAC785:30-3-4. Thus, while notice to those persons owning or leasing the surface estate of lands located within three miles of the outside boundary of a swine animal feeding operation is not required by the Groundwater Law, or the current rules promulgated by the Board thereunder, the question is whether such persons are entitled to notice and an opportunity to be heard under the Constitutions of the United States and the State of Oklahoma.
¶ 31 In general, governments cannot affect a person's liberty or property interest without affording that person his or her due process rights, which usually requires notice and a meaningful opportunity to address the issues involved. See, e.g., Perry v.Sindermann, 408 U.S. 593 (1972); Board of Regents v. Roth,408 U.S. 564 (1972). As quoted in the case Marshall Oil Corporationv. Adams, 688 P.2d 37 (Okla. 1983):
 The United States Supreme Court in Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314-315, 70 S.Ct. 652, 657, 94 L.Ed. 865, (1949), determined that "interested parties" should be provided the full opportunity to appear and be heard:
 An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.
Marshall Oil Corporation at 40, n. 9.
¶ 32 As discussed in Attorney General Opinion 96-76, dated November 1, 1996, the case that is perhaps most instructive on the due process right to notice and opportunity to be heard in the context of property rights and landowners is DuLaney v.Oklahoma State Department of Health, 868 P.2d 676 (Okla. 1993) wherein the Oklahoma Supreme Court recognized that notice and an opportunity for hearing must be afforded to citizenry whose health, property use, and drinking water may be affected by governmental action, since the due process clauses of the United States and Oklahoma Constitutions provide that certain substantive rights, such as those of life, liberty and property, cannot be deprived by governmental action except by constitutionally adequate procedures. Id. at 681. In DuLaney,
the Oklahoma Supreme Court acknowledged that:
 Minimum standards of due process require administrative proceedings that may directly and adversely affect legally protected interests be preceded by notice calculated to provide knowledge of the exercise of adjudicative power and an opportunity to be heard.
Id. at 684-85 (emphasis added).
¶ 33 The facts of DuLaney revolved around the application for and issuance of a landfill permit, and the contentions of certain mineral interest owners and adjacent landowners that they were entitled to notice and an opportunity to be heard in relation to the application since the issuance of a landfill permit would hinder their ability to explore for and develop minerals, and would potentially involve air and groundwater pollution, odor, traffic, and safety concerns. The Oklahoma Supreme Court determined that both the mineral interest owners and adjacent landowners were entitled to notice and an opportunity to be heard in relation to the application for the landfill permit since the issuance of such permit might impair the recognized and well-defined property rights of the mineral interest owners,id. at 681, and the adjacent landowners. Id. at 683.
¶ 34 Like the situation in DuLaney, proceedings before the Board relating to an application to use groundwater for swine animal feeding operations involve issues that may directly and adversely impact the property interests of owners or lessees of surface estates within three miles of the outside boundaries of swine animal feeding operations. Indeed, the Oklahoma Legislature recognized such property interests, and the potentially harmful environmental effects of swine animal feeding operations on such interests, when it enacted the three-mile setback found at 82O.S. Supp. 1998, § 1020.11a[82-1020.11a], as well as the right and ability of property owners to waive, in writing, this three-mile setback. The potential harm to these owners or lessees is not easily rectified, but rather involves the potential for harmful contaminants in both the air and in groundwater, odor, property devaluation, and safety hazards, all arising from such swine animal feeding operation.[2] DuLaney at 682.
¶ 35 In conclusion, owners and lessees of surface estates within three miles of the outside boundaries of swine animal feeding operations have legally protected rights sufficient to require the application of due process privileges guaranteed by the United States and Oklahoma Constitutions, which constitutionally protected interests would not be sufficiently protected after those rights were irreparably damaged by the granting of a permit to use groundwater for a swine animal feeding operation without notice and opportunity to be heard.
¶ 36 Therefore, in addition to publication, applicants for the use of groundwater for swine animal feeding operations must provide individual notice, reasonably calculated under all of the circumstances, to all record owners and lessees of surface estates within three miles of the outside boundaries of the swine animal feeding operation that is the subject of the groundwater application in question. As required by due process, such notice must apprise these interested parties of the pendency of the applicant's groundwater application and must afford these interested parties a reasonable opportunity to appear and present their objections.
¶ 37 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. The Oklahoma Water Resources Board's interpretation of theterm "nonprofit organization" in 82 O.S. Supp. 1998, §1020.11a[82-1020.11a], which provides for a three-mile setback of swineanimal feeding operations from certain camps and recreationalsites, to include the United States government, its subdivisions,the government of the State of Oklahoma, its subdivisions, andlocal governments, is reasonable and supported by the legislativepurpose of 82 O.S. Supp. 1998, § 1020.11a[82-1020.11a].
 2. The Oklahoma Water Resources Board's interpretation of 82O.S. Supp. 1998, § 1020.11a[82-1020.11a], which provides for a three-milesetback of swine animal feeding operations from certain camps andrecreational sites, to apply only to areas or facilities whichare used or capable of being used for outdoor camping and outdoorrecreational activities at least six months each year isunauthorized and in excess of the jurisdictional grant of theOklahoma Water Resources Board's rulemaking authority.
 3. A facility or area owned or operated by a nonprofitorganization must be a camp or recreational site to be protectedby the three-mile setback provision set forth at 82 O.S. Supp.1998, § 1020.11a[82-1020.11a].
 4. Applicants seeking permits or amendments to permits to usegroundwater for a swine animal feeding operation should berequired to provide notice to all record owners or lessees of thesurface estate of lands located within three miles of the outsideboundary of the swine animal feeding operation pursuant toSection 1 of the Fourteenth Amendment of the United StatesConstitution and Article 2, § 7 of the Oklahoma Constitution.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
CANNON MILES TOLBERT ASSISTANT ATTORNEY GENERAL
STEPHEN L. JANTZEN ASSISTANT ATTORNEY GENERAL
[1] The term "interested party" has received certain attention from the Oklahoma Supreme Court, albeit not in the context of the Groundwater Law. In the case First National Bank v. OklahomaSavings and Loan Board, 569 P.2d 993 (Okla. 1977), the Oklahoma Supreme Court wrote that "interested parties" are "those who have a legally recognized private interest, and not simply a possible pecuniary benefit." Id. at 996. Moreover, persons are parties to administrative proceedings either by being named as such, becoming a party by applicable statute, or if his or her interest therein is of constitutional proportions. Id.
[2] Importantly, and as recognized by the Oklahoma Supreme Court in DuLaney, the trend is toward enlargement of the class of persons who may protest administrative actions. Id. at 683. Additionally, matters of the use and control of groundwater arepublici juris, and of immediate local, national, and international concern. Id. at 684; Oklahoma Water ResourcesBoard v. Texas County Irrigation and Water ResourcesAssociation, 711 P.2d 38, 43 (Okla 1984).